UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| STEELRAY CONSULTING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>OVERSTOCK.COM, INC., and DOES 1–20,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [65] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING [66] DEFENDANT'S MOTION TO PARTIALLY EXCLUDE EXPERT WITNESS TESTIMONY**<br><br>Case No. 2:23-cv-00530-DBB-DAO<br><br>District Judge David Barlow |

Before the court are Defendant's Motion for Summary Judgment[1] and Defendant's *Daubert* Motion to Partially Exclude Expert Witness Testimony.[2] Having reviewed the briefs, the court finds that oral argument is not necessary.[3]

**BACKGROUND**

This case arises out a contractual dispute between Plaintiff Steelray Consulting, LLC ("Steelray") and Defendant Overstock.com, Inc. ("Overstock"). Steelray alleges that it developed a "web scraping" technology that acts as a search engine for online vehicle sales and that it sold this technology to Overstock at a steep discount as part of a profit-sharing arrangement.[4] Steelray further alleges that the parties built a business, Overstock Cars, around this technology.[5] Plaintiff

---

[1] Motion for Summary Judgment ("MSJ"), ECF No. 65, filed Dec. 22, 2025.
[2] Motion to Partially Exclude Expert Witness Testimony ("*Daubert* Motion"), ECF No. 66, filed Dec. 22, 2025.
[3] *See* DUCivR 7-1(g).
[4] Compl. ¶ 15, ECF No. 2, filed Aug. 16, 2023.
[5] *Id.* at 2.

now claims that Defendant violated the parties' agreements relating to Overstock Cars and seeks damages arising out of breach of contract and breach of the implied covenant of good faith and fair dealing.[6] Overstock asks the court to grant judgment in its favor on the grounds that Plaintiff failed to satisfy a necessary condition precedent to recovery under the contract and because Plaintiff's requested damages are not permissible or are not supported by relevant expert testimony.[7]

<strong>STATEMENT OF FACTS</strong>

**Contract**

On September 2, 2016, the parties entered into a Consulting Agreement and a Statement of Work ("SOW") Agreement.[8] These agreements lay out the parties' respective duties and rights related to Overstock Cars. Section 11 of the SOW governs Steelray's (denominated "Consultant" in the agreement) right to "split off" Overstock Cars from Overstock.[9] This section provides in part:

> **11. Split-off of Overstock Cars from Overstock.com.** Should Consultant acquire sufficient Independent funding for Overstock Cars, Overstock Cars shall split off immediately upon Consultant receiving this funding."[10] Split-off shall be accomplished by:
>
> a. Overstock shall transfer 100% of stock shares in Overstock.com Cars, Inc. ("Stock") to either (i) Consultant or (ii) another third party upon the approval of Consultant. Overstock and Consultant shall work together to complete all necessary steps to effectuate legal transfer of ownership in a reasonable period of time.
>
> b. In exchange for the Stock, Thirty-three percent (33%) of the direct expenditure in Overstock Cars by Overstock since July 15, 2015 shall be paid back to Overstock. The date that Overstock receives these funds is the start date of the

---

[6] *Id.* ¶¶ 76–84.

[7] MSJ 2.

[8] Consulting Agreement, ECF No. 65-1 at 5–7, filed Dec. 22, 2025; Statement of Work #2 ("SOW"), ECF No. 65-1 at 8–12, filed Dec. 22, 2025.

[9] SOW § 11.

[10] *Id.*

split for the purposes of calculating deadlines and obligations as described herein ("Split Date").

c. As further consideration for the Stock, the remaining sixty-seven percent (67%) of the direct expenditure in Overstock Cars by Overstock since July 15, 2015 shall be paid back to Overstock in equal installments over the next 24 months tolled from the Split Date.

d. Should Overstock Cars not be able to generate positive Management Income on the Split Date, then, in addition to securing funding sufficient to reimburse Overstock for 33% of its direct expenditure in Overstock Cars since July 15, 2015 as described above in Section 11(b), Consultant shall secure additional funding that covers one full year of operating expenses, calculated from the trailing year of expenses from the Split Date.

. . .

h. For five (5) years from the Split Date, Overstock Cars shall have the option, at the discretion of Overstock Cars, of any of the following benefits ("Continuing Benefits"): (A) continued presence on Overstock's website; (B) a continuing license to Overstock's trademarks and copyrights as described in Section 7 herein; (C) inclusion in Overstock's regular emails sent to customers no less than three times a month; and (D) the right to continue to e-mail or contact Overstock Cars customers that had conformed to the requirements of Section 5a. . . .[11]

Additionally, § 12 of the SOW allows Overstock to "terminate the Overstock Cars business for convenience upon six (6) months' notice."[12] However, the termination clause specifically reserves for Steelray a "12-month wind-down period in which [Steelray] has the opportunity to secure the necessary funding required to invoke the split off terms set forth in Section 11 of the SOW."[13] Section 12(2) provides:

**2. While Patrick M. Byrne is the CEO of Overstock.** The Agreement and/or this SOW #2 may be terminated by either party for convenience while Patrick M. Byrne is the CEO of Overstock upon seven days prior written notice. Despite termination as permitted under this Section, Consultant shall be entitled to one of the following: 1) additional compensations described in Section 8 above for a period of 24 months from the date of termination, so long as Overstock Cars generates sufficient revenue as set forth in Section 8 during the 24 month period subsequent to termination or 2) a 12-month wind-down period in which Consultant

---

[11] *Id.* (emphasis in original).
[12] *Id.* § 12.
[13] *Id.* § 12(2).

has the opportunity to secure the necessary funding required to invoke the split off terms set forth in Section 11 of the SOW. If funding is not raised within the wind-down period, or the search for funding is terminated for any reason prior to the end of the wind-down period, the Agreement and SOW are immediately terminated with no additional liability or compensation to the Consultant.[14]

**Digital Air Strike Valuation**

On March 30, 2018, Ms. Erica Sietsma of Digital Air Strike sent an email to Steelray's CEO and another Overstock employee with the subject line "DAS Cars by Overstock Proposal and Presentation."[15] This email discusses a "proposed offer" and references a "$12 million investment for 12% (valuation of $100MM) of Cars by Overstock."[16] On May 7, 2018, Digital Air Strike sent Overstock a "Non-Binding Letter of Intent" that references the Overstock recipients' "representation that the Company has a total valuation of one hundred million dollars ($100,000,000 USD)" and outlines a proposal similar to the one mentioned in the earlier email.[17] Later, Digital Air Strike's corporate representative testified that Digital Air Strike did not prepare the one hundred million dollar valuation[18] and that the number came from Steelray's CEO or from an Overstock employee.[19]

**Termination**

On December 18, 2018, Overstock terminated the SOW.[20] Under § 12(2) of the SOW, Steelray had until December 28, 2019, to secure funding to initiate the "split off" described in

---

[14] *Id.* (emphasis in original).
[15] March 30, 2018, Email ("DAS Proposal Email"), ECF No. 67-3, filed Feb. 9, 2026.
[16] *Id.*
[17] Digital Air Strike Letter of Intent ("DAS Letter of Intent"), ECF No. 65-1 at 204–09, filed Dec. 22, 2025.
[18] Digital Air Strike Deposition 72:17–22, ECF No. 65-1 at 175–203, filed Dec 22, 2025.
[19] *Id.* at 103:17–19.
[20] Opposition to Motion for Summary Judgment ("Opp'n") 16, ECF No. 67, Feb. 9, 2026; December 18, 2018, Email ("Agreement Termination Email"), ECF No. 67-11, filed Feb. 9, 2026.

SOW § 11.[21] On January 7, 2019, Overstock sent a letter to Steelray purporting to terminate the 12-month wind-down period and search for funding described in SOW § 12(2).[22] The SOW does not grant Overstock the right to terminate the wind-down period.[23] Sometime in January 2019, Overstock took down the Overstock Cars website.[24]

During the wind-down period, Steelray contacted at least three potential investors about funding the Overstock Cars split.[25] One potential investor, High Lifter, verbally agreed with Steelray to provide the necessary funds to accomplish the split-off.[26] According to High Lifter's corporate representative, High Lifter believed that the deal would provide it with "access to a large Overstock email database" and "some presence on the Overstock website."[27] In September 2019, Steelray sent Overstock a letter stating that it had secured an investor and intended to move forward with the § 11 split-off as permitted by § 12(2).[28] Steelray requested information regarding Overstock's expenditures on Overstock Cars because § 11 requires payment of a portion of those expenditures to initiate a split-off.[29] Overstock responded by writing that Steelray's wind-down rights had been terminated and that Steelray could not audit Overstock's direct expenditures because the wind-down terms did not apply.[30] Nevertheless, Overstock stated that it was open to entertaining an offer for Overstock Cars and represented that it had spent

---

[21] Opp'n 16; December 26, 2018, Email ("Wind Down Email"), ECF No. 67-12, filed Feb 9, 2026.
[22] Opp'n 16–17; January 7, 2019, Letter ("Wind Down Termination Letter"), ECF No. 67-13, filed Feb 9, 2026.
[23] Opp'n 17; *see also* SOW § 12.
[24] Opp'n 17; January 26, 2019, Email ("Website Removal Email"), ECF No. 67-15, filed Feb 9, 2026.
[25] Opp'n 18.
[26] Opp'n 20; High Lifter Deposition 58:12–59:4, ECF No. 65-1 at 274–91, filed Dec. 22, 2025.
[27] High Lifter Deposition 32:17–33:2.
[28] Opp'n 20; September 2019 Letter ("Split-Off Request Letter"), ECF No. 65-1 at 227–29, filed Dec. 22, 2025.
[29] Split-Off Request Letter; SOW § 11(b).
[30] October 2, 2019, Letter ("Split-Off Response Letter"), ECF No. 67-5, filed Feb. 9, 2026.

approximately $5.4 million on Overstock Cars.[31] Ultimately, Steelray did not pay Overstock any portion of the split-off price.[32]

**Expert Witness**

Steelray hired Dr. Jonathan Hochman as an expert witness to help support some of its claimed damages.[33] Dr. Hochman's report discusses the value of certain digital marketing rights that Steelray claims were contractually owed, specifically Overstock's alleged obligations to include Steelray in three marketing emails per month for five years and to include Overstock Cars on a tab on Overstock's website.[34] Dr. Hochman uses a "cost per mille" (CPM)—the "cost to display an advertisement 1,000 times"—in his value calculations.[35] He determined the likely CPM of displaying advertisements through Overstock's email list and webpage in the context of Steelray's claimed rights.[36] He then calculated the number of views or impressions that Steelray likely would have received based on its claimed marketing rights and multiplied that number by the CPM to quantify the marketing rights' overall value.[37]

Dr. Hochman concludes that the "fair market replacement value" of the marketing rights at issue amounts to $50,298,526.[38] In his deposition he defines "fair market replacement value" as "the value of the exposure on the navigation tab as one element and the placement in the Overstock marketing e-mails as another element," describing what those elements could have

---

[31] *Id.*
[32] Opp'n 21.
[33] *Id.*
[34] *See* Dr. Jonathan Hochman Expert Report ("Hochman Report"), ECF No. 66-3, filed Dec. 22, 2025.
[35] *Id.* at 18.
[36] *Id.* at 38–43.
[37] *Id.* at 37–51.
[38] *Id.* at 19.

been sold for if Overstock had tried to sell them.[39] Dr. Hochman further describes his estimation of the marketing rights' value as what someone would be willing to pay for them in the market,[40] the cost someone would have to pay in the market to get the kind of exposure that was promised to Steelray,[41] and what a hypothetical advertiser would pay Overstock for a tab on its website.[42] The deposition also contains the following exchange:

> Q. [Attorney] you're not testifying as to whether these market rights would be bought or sold at a certain value on an open market?
> A. [Dr. Hochman] Yeah, no. I think I'm saying that this is the cost at which these rights or rights similar to them or equivalent of comparable are bought and sold.[43]

## STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[44] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[45] The movant "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[46] When viewing the record, the court "draw[s] all reasonable inferences therefrom most favorably to the nonmovant."[47]

---

[39] Dr. Jonathan Hochman Deposition ("Hochman Deposition") 31:11–32:2, ECF No. 66-2, filed Dec. 22, 2025.
[40] *Id.* at 33:23–34:9.
[41] *Id.* at 105:6–21.
[42] *Id.* at 225:19–226:5.
[43] *Id.* at 106:3–11 (objection omitted).
[44] Fed. R. Civ. P. 56(a).
[45] *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1169 (10th Cir. 2021) (citation omitted).
[46] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).
[47] *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016) (citation omitted).

## DISCUSSION

### I.   Failure to Satisfy a Condition Precedent

Overstock argues that it is entitled to summary judgment because Steelray failed to secure the required funding to trigger its split-off rights.[48] According to Overstock, the SOW required Steelray to receive adequate funding as a condition precedent to a split-off occurring.[49] Overstock contends that this condition was not met because Steelray never received the promised funds from High Lifter and because the SOW did not permit the type of investment that High Lifter intended.[50]

#### A.   Acquiring Funding

##### 1.   Contractual Ambiguity

Section 11 of the SOW provides that "[s]hould [Steelray] acquire sufficient independent funding for Overstock Cars, Overstock Cars shall split off immediately upon [Steelray] receiving this funding.[51] Overstock argues that the plain meaning of this clause requires Steelray to "come into possession" of independent funding before it has any right to a split-off.[52] Because Steelray never received funds from High Lifter, Overstock contends that this condition precedent was not satisfied.[53] Steelray responds that these terms are not defined and that the phrase "secure funding" is also used in the SOW in § 11 and § 12(2).[54] It argues that these terms more

---

[48] MSJ 18.
[49] *Id.*
[50] *Id.* at 18–21.
[51] Sow § 11.
[52] MSJ 20.
[53] *Id.*
[54] Opp'n 37–38; SOW §§ 11(d), 12(2).

8

appropriately refer to obtaining a binding commitment for funding in commercial practice than the physical transfer of money.[55]

Under Utah law, courts "look to the language of the contract to determine its meaning and the intent of the contracting parties."[56] "Where 'the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law.'"[57] Ambiguity exists when a contract term "is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[58] "Whether an ambiguity exists in a contract is a question of law."[59] However, once a court determines that ambiguity exists, "the intent of the parties becomes a question of fact."[60] Thus, when parties present "contrary, tenable interpretations" of contractual language, a question of fact arises, and summary judgment on the issue is not warranted.[61]

In this case, the SOW's funding language is ambiguous. The SOW itself does not define the disputed terms, so the parties direct the court to various dictionary definitions to support their respective arguments.[62] One ordinary dictionary definition of *receive* is simply, "to come into

---

[55] *Id.*

[56] *Cafe Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235, 1240.

[57] *Id.* (quoting *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134).

[58] *Id.*

[59] *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139, 1145 (quoting *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991)).

[60] *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 14, 28 P.3d 669, 675, *holding modified on other grounds by Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2010 UT 6, ¶ 14, 230 P.3d 1000; *see also Plateau Min. Co. v. Utah Div. of State Lands & Forestry,* 802 P.2d 720, 725 (Utah 1990) ("When ambiguity does exist, the intent of the parties is a question of fact to be determined by the jury.").

[61] *SME Indus*, 28 P.3d at 675.

[62] *See* MSJ 20; Opp'n 38.

possession of,"[63] and one definition of the word *acquire* is "to come into possession or control of."[64] Potentially relevant definitions of *secure* include "to put beyond hazard of losing or of not receiving" or "to give pledge of payment to (a creditor) or of (an obligation)."[65] Both parties present reasonable interpretations of how these terms collectively shape the meaning of §§ 11 and 12 of the SOW. On one hand, the requirement that Steelray receive, acquire, or secure funding could be interpreted to mean that Steelray must have the money liquid and in its possession. On the other hand, securing, acquiring, or receiving funding could mean that Steelray only needs to have control of the funds via a binding commitment from a third party that the money will be delivered as Steelray directs.[66] Because each party puts forth a contrary but reasonable interpretation of the SOW's funding requirements, a fact question exists regarding the parties' intent, and summary judgment cannot be granted on the issue.[67]

### 2. High Lifter Investment

Overstock next argues that High Lifter was not planning to invest in Overstock Cars consistent with the SOW.[68] Instead, High Lifter believed it was purchasing marketing rights for itself, something that is impermissible under the contract.[69] Overstock concludes that High Lifter's commitment could not satisfy the SOW's funding requirements because Steelray was

---

[63] *Receive,* MERRIAM-WEBSTER DICTIONARY (11th ed.), https://www.merriam-webster.com/dictionary/receive [https://perma.cc/8TC7-8AT7].
[64] *Acquire,* MERRIAM-WEBSTER DICTIONARY (11th ed.), https://www.merriam-webster.com/dictionary/acquire [https://perma.cc/Z6DA-QC3P].
[65] *Secure,* MERRIAM-WEBSTER DICTIONARY (11th ed https://www.merriam-webster.com/dictionary/secure [https://perma.cc/G7SC-ZYJN].
[66] The court does not decide which, if any, of the proposed dictionary definitions most accurately apply to the contract or which party's interpretation is correct. The court only concludes that sufficient ambiguity exists to create a question of fact.
[67] *SME Indus*, 28 P.3d at 675.
[68] MSJ 18.
[69] *Id.* at 18–19.

contractually prohibited from assigning the rights High Lifter intended to purchase.[70] Steelray responds that High Lifter had committed the funds and that any potential disagreement between Steelray and High Lifter did not nullify the SOW.[71]

Section 11 and 12(2) of the SOW requires Steelray to secure or receive "sufficient funding" before initiating a split-off, but the source of that funding is not specified.[72] In other words, it is the acquisition of funding, not a third-party's motivation for pledging that funding, that has legal significance under the SOW. Steelray has presented evidence that could permit a jury to conclude it had a commitment from High Lifter as of September 2019 to pay for the Overstock Cars deal.[73] Given the SOW's uncertain language, this evidence creates a dispute of material fact about Steelray's satisfaction of a condition precedent. Overstock's argument that a disagreement may have later arisen between Steelray and High Lifter regarding the terms of the funding agreement is not sufficient to show that Steelray did not acquire funding as a matter of law.

### B.    Anticipatory Breach and Prevention Doctrine

Steelray also responds that its obligation to satisfy the SOW's condition precedent was excused by Overstock's anticipatory breach of the agreement and because Overstock prevented Steelray from fulfilling the condition.[74]

---

[70] *Id.*

[71] Opp'n 39. Steelray also argues that High Lifter and its attorneys had read the SOW and were aware of the scope of the rights available. *Id.* at 39–40; *see also* High Lifter Deposition 41:1–9.

[72] SOW §§ 11, 12(2).

[73] High Lifter Deposition 58:17–26.

[74] Opp'n 31–32.

11

### 1.      Anticipatory Breach

Steelray first argues that Overstock anticipatorily breached the SOW by attempting to terminate the wind-down period and by stating that it did not intend to honor the split-off rights.[75] Steelray contends that this breach excused its obligation to satisfy the condition precedent.[76] In Utah, "'[a]n anticipatory breach of contract is one committed before the time has come when there is a present duty of performance, and is the outcome of words or acts *evincing an intention to refuse performance in the future.*'"[77] "A party who is wronged by an anticipatory breach has a choice whether to sue immediately or to '[t]reat the contract as still binding and wait until the time arrived for its performance and at such time bring an action on the contract.'"[78] However, "where the duty of the obligor to perform is contingent upon the occurrence or existence of a condition precedent, the obligee may not require performance by the obligor, because the obligor's duty, and conversely the obligee's right to demand performance, does not arise until that condition occurs or exists."[79]

Here, even if Overstock's actions constituted anticipatory breach, Steelray never paid Overstock the thirty-three percent of direct expenditures necessary to initiate a split.[80] Therefore, Overstock's obligation to provide the split-off benefits never arose, and the time for Steelray to require performance never arrived.[81] Steelray's argument that one party's anticipatory breach

---

[75] *Id.* at 33.
[76] *Id.*
[77] *Clarke v. Living Scriptures, Inc.*, 2005 UT App 225, ¶ 13, 114 P.3d 602, 604 (quoting *Upland Indus. Corp. v. Pacific Gamble Robinson Co.,* 684 P.2d 638, 643 (Utah 1984)) (emphasis in original).
[78] *Hunter v. Finau*, 2024 UT App 17, ¶ 33, 545 P.3d 294, 304, *cert. denied*, 550 P.3d 993 (Utah 2024) (quoting *Hurwitz v. David K. Richards & Co.*, 20 Utah 2d 232, 436 P.2d 794, 796 (1968)).
[79] *Id.* (quoting *Harper v. Great Salt Lake Council, Inc.*, 1999 UT 34, ¶ 14, 976 P.2d 1213).
[80] Opp'n 21 ("a check to fund the split-off was never received by Overstock").
[81] *See Hunter*, 545 P.3d at 304.

automatically waives any unfulfilled conditions precedent is not supported by *Hardy v. Montgomery*, the case it cites for this proposition.[82]

In *Hardy*, a landlord and his tenants signed a lease agreement with a purchase option that gave the tenants the right to purchase the property with financing from the seller as long as they were not in default.[83] The tenants paid $7,000 in non-refundable earnest money as consideration for the option.[84] The tenants later fell behind in their payments, and the landlord sent a letter stating that he would not finance the purchase and giving the tenants seven days to cure their default.[85] The court found that this letter amounted to anticipatory repudiation of the landlord's financing obligations because he had given the tenants time to cure their default.[86] But the damages for this breach only amounted to a finding that the landlord could not keep the $7,000 of earnest money because his anticipatory breach precluded the tenants from exercising the purchase option.[87]

The court in *Hardy* did not hold that the landlord's breach waived the default condition in the purchase option; instead, it affirmed that it would be unjust for the landlord to keep the deposit given that his anticipatory breach prevented the tenants from exercising the option.[88] This conclusion does not support Steelray's contention that it can now seek the benefits of the split-off without having fulfilled the SOW's condition precedent to initiating that split-off.

---

[82] Opp'n 32–33.
[83] *Hardy v. Montgomery*, 2018 UT App 133, ¶ 2, 428 P.3d 78, 81.
[84] *Id.*
[85] *Id.* at 84.
[86] *Id.*
[87] *Id.* at 82, 84–85.
[88] *Id.*

## 2.    Prevention Doctrine

Steelray's next argument more closely aligns with the principle applied in *Hardy*.

Steelray contends that Overstock cannot use the lack of payment or funding as a defense because

Overstock itself frustrated Steelray's ability to satisfy that condition.[89] Overstock replies that it

could not have prevented Steelray from satisfying the condition because High Lifter was willing

to provide the funding, and Steelray simply failed to tender the necessary funds.[90]

"It is basic contract law that a party who prevents the occurrence of a condition precedent

may not stand on that condition's non-occurrence to refuse to perform his part of the contract."[91]

Utah courts apply this prevention doctrine to establish that "[w]hen one party wrongfully hinders

or prevents the occurrence of a condition precedent to its performance—such as the performance

of the other party—it may not rely on the nonoccurrence of that condition to avoid

performing."[92]

In this case, the SOW required Steelray to acquire sufficient funding and pay a portion of

Overstock's direct expenditures in order to initiate a split-off and require Overstock to fulfill its

associated obligations.[93] However, Steelray has offered evidence showing that Overstock

repeatedly stated that it had terminated Steelray's § 12(2) wind-down rights,[94] that Overstock

took down the Overstock Cars website during the wind-down period,[95] and that Overstock

---

[89] Opp'n 34.

[90] Reply in Support of Motion for Summary Judgment ("Reply") 15–16, ECF No. 71, filed Mar. 12, 2026.

[91] *Stroh v. Datamark, Inc.*, No. 2:05-CV-867 TS, 2007 WL 990277, at *2 (D. Utah Mar. 29, 2007) (quoting *Swaback v. American Info. Tech. et al.*, 103 F.3d 535, 542 (7th Cir. 1996)).

[92] *Tooele Assocs. Ltd. P'ship v. Tooele City*, 2012 UT App 214, ¶ 31, 284 P.3d 709, 718; *see also Baxter v. Saunders Outdoor Adver., Inc.*, 2007 UT App 340, ¶ ¶ 14–15, 171 P.3d 469 ("[N]o one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance.").

[93] SOW § 11.

[94] *See* Wind Down Termination Letter; Split-Off Response Letter.

[95] *See* Website Removal Email.

refused to permit Steelray to audit its claimed expenditures.[96] Given this evidence, a jury could reasonably conclude that Overstock hindered or prevented Steelray from acquiring sufficient funding and paying the expenditures necessary to initiate a split-off.

Overstock's argument that High Lifter was willing to provide funds in spite of Overstock's actions does not change that conclusion. Even if the jury finds that Steelray did not "receive" funding from High Lifter as required by the SOW, it could still find that Overstock's actions prevented other investors from providing the funding. And Overstock's argument that Steelray had funding but did not pay faces the same obstacle. There is a genuine factual dispute as to whether Overstock's actions hindered or prevented Steelray's payment.

## II.    Damages

Overstock next argues that Steelray's claims fail because it cannot prevail on any of its damages theories.[97] In Utah, damages are an essential element of a breach of contract claim.[98] "[A]n award of damages in a breach of contract case attempts to 'place the aggrieved party in the same economic position the party would have been in if the contract was not breached.'"[99] Plaintiffs in a breach of contract case "can only recover 'general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was entered into.'"[100] In its

---

[96] *See* Split-Off Response Letter.

[97] MSJ 10.

[98] *Daz Mgmt., LLC v. Honnen Equip. Co.*, 2022 UT 15, 508 P.3d 84, 91 n.26 (quoting *Richards v. Cook,* 2013 UT App 250, ¶ 7, 314 P.3d 1040). ("The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.").

[99] *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶ 28, 424 P.3d 897, 904 (quoting *Christensen & Jensen, P.C. v. Barrett & Daines*, 2008 UT 64, ¶ 26, 194 P.3d 931).

[100] *Thurston v. Workers Comp. Fund of Utah*, 2003 UT App 438, ¶ 21, 83 P.3d 391, 397 (quoting *Castillo v. Atlanta Cas. Co.,* 939 P.2d 1204, 1209 (Utah Ct. App.), *cert. denied,* 945 P.2d 1118 (Utah 1997)).

Rule 26 damages disclosure, Steelray identifies two alternative measures of its damages: (1) the enterprise value of Overstock Cars, which Steelray values at $100 million and (2) the Overstock Cars website "technology, which Steelray values at $5 million, along with the SOW § 11(h) marketing rights, which are valued by Steelray's expert at around $50 million.[101] Overstock argues that each of these damage valuations is irrelevant to the damages alleged or is unsupported by sufficient evidence.[102]

### A.    Marketing Rights

Section 11(h) of the SOW provides for certain "continuing benefits" to Overstock Cars for five years following a split-off, including "a continued presence on Overstock's website" and inclusion in Overstock's customer emails "no less than three times a month."[103] Dr. Hochman, Plaintiff's damages expert, calculates the "fair market replacement value" of these marketing rights to be $50,298,526.[104] Overstock argues that Steelray cannot establish these claimed damages because expert testimony is needed to establish the market value of the rights and Dr. Hochman's opinion should be excluded under *Daubert*.[105]

Because Overstock's request for summary judgment on this issue depends on its argument that Dr. Hochman's testimony should be excluded, the court will first consider Defendant's *Daubert* Motion. Rule 702 of the Federal Rules of Evidence allows expert testimony if the court determines that the testimony (1) will help the trier of fact understand the evidence, (2) is based on sufficient facts and data, (3) is the product of reliable principles and methods, and

---

[101] Third Supplemental Rule 26 Disclosure ("Damages Disclosure") 11, ECF No. 65-1 at 13–31, filed Dec. 22, 2025.
[102] MSJ 11.
[103] SOW § 11(h).
[104] Hochman Report 19.
[105] MSJ 11–12.

(4) reflects a reliable application of methods to the facts.[106] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the United States Supreme Court clarified that Rule 702 requires expert testimony to be both relevant and reliable.[107] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[108]

In this case, Overstock does not contend that Dr. Hochman's methods were unreliable. Instead, it argues that his testimony is irrelevant because the $50 million figure he calculates does not describe the value of the marketing rights in a way that is legally permissible to calculate damages.[109] Overstock describes the marketing rights as an "income-producing asset"[110] and argues that loss of such an asset can only be compensated by an award of the market value of the asset at the time of the contractual breach.[111] Overstock further argues that the market value of an income-producing asset "represents what a buyer is willing to pay for the chance to earn . . . speculative profits."[112] Overstock contends that Dr. Hochman's value calculation represents the replacement cost of the rights rather than their market value, particularly because he did not do any analysis of the potential profits that the marketing rights may have earned.[113]

---

[106] Fed. R. Evid. 702.
[107] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993).
[108] Fed. R. Evid. 401
[109] *Daubert* Motion 9–10.
[110] *Id.* at 6.
[111] *Id.* at 7.
[112] *Id.* (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000)).
[113] *Id.* at 9–10.

17

Steelray responds that an asset may be valued based on its income-producing potential but that such a valuation is not the only viable approach.[114] Steelray argues that it is not seeking consequential damages based on speculative profits and that its claimed damages relate to lost marketing exposure rather than some secondary right to earn profits.[115]

Utah law does not specifically address damages in terms of income-producing assets, but it does incorporate the basic principle that general damages for breach of contract claims "are measured by 'the market value of the very thing promised, at the time of performance.'"[116] "Ordinarily, market value is defined as the price for which an article is bought and sold and for which there exists a demand in the market place."[117] The parties do not dispute Overstock's assertion that loss of the marketing rights "is properly compensated only by an award of the market value of the asset at the time of the breach."[118] Instead, they disagree about whether Dr. Hochman's analysis describes the market value.

The disputed marketing rights in SOW § 11(h) would give Steelray the right to a limited presence on Overstock's website and in Overstock emails for five years.[119] Dr. Hochman bases his analysis on the premise that the value of such a presence is commonly determined by the

---

[114] Opposition to Motion to Exclude Expert Witness Testimony ("*Daubert* Opp'n") 7, ECF No. 68, filed Feb. 9, 2026.

[115] *Id.* at 11.

[116] *Trans-W. Petroleum, Inc. v. United States Gypsum Co.*, 2016 UT 27, ¶ 16, 379 P.3d 1200, 1206 (citing DOBBS, LAW OF REMEDIES § 12.1(1)).

[117] *Winters v. Charles Anthony, Inc*., 586 P.2d 453, 454 (Utah 1978); *see also Belnorth Petroleum Corp. v. State Tax Comm'n of Utah*, 845 P.2d 266, 270 (Utah Ct. App. 1993) ("The 'market value' of an item is typically defined as the amount a willing buyer would pay a willing seller."); *State v. England*, 2017 UT App 170, ¶ 13, 405 P.3d 848, 852 (quoting *State v. Ludlow*, 2015 UT App 146, ¶ 6, 353 P.3d 179) ("Fair market value is measured by what the owner [of the property] could expect to receive, and the amount a willing buyer would pay to the true owner for the . . . item.").

[118] *Daubert* Motion 7 (quoting *Holland v. United States*, 83 Fed. Cl. 507, 514 (2008)); *see also Daubert* Opp'n 9–10 (stating that the *Holland* market value requirement is "not controversial").

[119] SOW § 11(h).

18

CPM, the cost to display an advertisement 1,000 times in a given context.[120] He estimates the respective CPM values of a presence on Overstock's webpage and in its emails then multiplies these values by an estimated number of views that would occur over a five-year period.[121] He describes the resulting number as the value that Overstock could have sold the placement on its navigation tab and in its marketing emails for if it had tried to sell those rights instead of including them in the deal with Steelray.[122] This is an estimation of the market value of the rights.

Overstock emphasizes some selections from Dr. Hochman's deposition that seem to contradict this conclusion. For example, Overstock cites to an exchange where Dr. Hochman was asked, "you're not testifying as to whether these rights would be bought or sold at a certain value on an open market?" and to which Dr. Hochman replied, "Yeah, no."[123] But he immediately continued, stating "I think I'm saying that this is the cost at which these rights or rights similar to them or equivalent of comparable are bought and sold."[124] And these snippets are part of a broader inquiry in which Dr. Hochman stated that "I would say that this is the cost—the market rate value or the market cost, what you'd have to pay, in the open market to get that kind of exposure . . . ."[125] Considering the testimony as a whole, Dr. Hochman's determination that the marketing rights mentioned in § 11(h) of the SOW would be bought or sold at a certain value is consistent with a description of market value. This is not nullified by his further statements that

---

[120] Hochman Report 18.
[121] *Id.* at 37–51.
[122] Hochman Deposition 31:11–32:2.
[123] *Daubert* Motion 3; Reply in Support of Motion to Exclude Expert Witness Testimony ("*Daubert* Reply"), ECF No. 72, filed Mar. 12, 2026; Hochman Deposition 106:3–8 (objection omitted).
[124] Hochman Deposition 106:9–11.
[125] *Id.* at 105:14–17.

19

Steelray would have to spend the same amount to purchase similar marketing benefits elsewhere.[126] The possible confusion in the testimony is insufficient to exclude it.

Overstock also argues that Dr. Hochman's description of the marketing rights based on the value of likely impressions does not describe market value because Dr. Hochman "performs no analysis of how many of those impressions would result in visits to Overstock's Cars tab, how many of those visits would result in purchases, and how many of those purchases would result in profits."[127] Utah has not addressed the issue of whether the market value of contractual marketing rights or similar assets should be calculated through a specific method. Overstock relies on *Schonfeld v. Hilliard*, a Second Circuit case, for the proposition that the "market value of an income-producing asset . . . represents what a buyer is willing to pay for *the chance* to earn the speculative profits."[128] Steelray responds that *Schonfeld* lays out an acceptable method of calculating hybrid consequential damages, but that it does not establish a mandatory method for calculating general damages.[129]

In this case, the court does not believe that a market value analysis of the marketing rights must necessarily consider prospective profits that could arise from those rights. To be sure, certain fact patterns could require such an analysis. For example, the value of a contractual right to profits in an upcoming film (to borrow a hypothetical posed by Overstock[130]) might require

---

[126] *See Id.* at 253:17–254:5. Though market value and replacement cost are not entirely synonymous concepts, they "may be the same dollar amount in a given fact situation." *Winters v. Charles Anthony, Inc.,* 586 P.2d 453, 454 (Utah 1978). If marketing presence is valued on the open market in terms of views produced as Dr. Hochman states, then it is not surprising that the value of the Overstock marketing presence here would be the same as the cost of purchasing a similar number and quality of views elsewhere.

[127] *Daubert* Motion 10.

[128] *Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000) (emphasis in original).

[129] *Daubert* Opp'n 10–11.

[130] *Daubert Motion* 9 n.10.

consideration of speculative prospective profits. But here, the direct contractual benefit that Steelray bargained for was a marketing presence in Overstock's emails and on its website.[131] Logically, the price that a business is willing to pay for a marketing presence or for marketing impressions naturally factors in the business's determination about whether its marketing investment will turn a profit. Thus, the CPM of marketing rights or impressions inherently accounts for the speculative risks and profits associated with purchasing those rights or impressions. Essentially, if the marketing rights' market value is based on the impressions and views that they can produce, and if those impressions already have a determinable value on the market, then admissibility does not require an expert to look at the speculative profits that could result from those rights. The value of the impressions and the marketing rights is already known within the market.

In sum, the issues Overstock raises with Dr. Hochman's testimony go to evidentiary weight, not admissibility. Dr. Hochman's testimony may be found to describe market value and thus be helpful in describing damages considerations to the jury.[132]

### B.      Overstock Cars Enterprise Value

Overstock also challenges Steelray's request for $100 million in damages for Overstock Cars' Enterprise value. Overstock argues that Steelray cannot use Digital Air Strike's statements as evidence of the $100 million figure because Digital Air Strike never actually valued

---

[131] SOW § 11(h).

[132] That is not to say that Dr. Hochman's $50,000,000 damages figure is accurate, only that it is a description of market value. Overstock could still present evidence to contradict Dr. Hochman's conclusions. The court has only held that his testimony will not be excluded on relevance grounds.

21

Overstock Cars.[133] Overstock further argues that Overstock Cars cannot be valued without testimony from an expert witness.[134]

The sole basis for Steelray's $100 million request for the enterprise value of Overstock Cars is its assertion that "Overstock Cars was valued at $100 million by a neutral third party and interested investor."[135] Steelray's damages disclosure states that "Digital Air Strike proposed the $100 million valuation."[136] However, the evidence on the record cannot reasonably support such a conclusion.

Only three pieces of evidence reference the $100 million figure. First, a March 30, 2018, email from Digital Air Strike mentions a $100 million valuation as a "key proposal item" but does not say where the cursory valuation originated.[137] Second, a non-binding, unexecuted, letter of intent from Digital Air Strike again mentions the $100 million figure and states that it was based on "your representation," which apparently referred to Jason Silver's (Steelray's Owner), Seth Moore's, or Overstock's representation of value.[138] Finally, Digital Air Strike's corporate representative testified during her deposition that Digital Air Strike never would have created a valuation and that the $100 million figure originated with Jason Silver or perhaps some other unidentified person at Overstock.[139]

A reasonable jury presented with this evidence would be unable to conclude that a neutral third-party investor created the $100 million valuation. The Digital Air Strike email that Steelray

---

[133] MSJ 14.
[134] *Id.* at 15.
[135] Damages Disclosure 11.
[136] *Id.*
[137] DAS Proposal Email 2.
[138] DAS Letter of Intent.
[139] Digital Air Strike Deposition 23:13–24.

relies on does not indicate where the valuation originated.[140] By contrast, the letter itself makes it clear that the valuation is not from Digital Air Strike. This is confirmed by Digital Air Strike's CEO. There is no conflicting evidence or testimony that would require any credibility determination. Because the record includes no evidence to support Steelray's assertion that Digital Air Strike prepared or proposed the $100 million valuation, Steelray's argument for Overstock Cars' enterprise value cannot succeed as a matter of law.[141]

### C.    Overstock Cars Website Value

Finally, Overstock argues that Steelray cannot support its request for $5 million in damages related to the value of the Overstock Cars website "technology."[142] Defendant contends that summary judgment on this issue is warranted because (1) Steelray values the website based on Overstock's costs to create it, and (2) the website's value will necessarily be offset by Steelray's contractual obligations under the SOW.[143]

In its damages disclosure, Steelray states that the Overstock Cars website "technology" it would have obtained in a split-off "was worth at least $5,000,000 pursuant to Overstock's internal calculations of the cost of building the technology."[144] Plaintiff has not provided any additional evidence to support the value of the website. Defendant argues that the damages available for the loss of an asset like a website may only reflect "the *plaintiff's* actual costs to rebuild, not the *defendant's* original cost of construction."[145] Plaintiff responds that original

---

[140] *Id.*

[141] Because there is insufficient evidence on the record to support Steelray's request for enterprise value damages, the court does not need to consider Overstock's additional argument that a business valuation necessarily requires expert testimony to establish damages.

[142] MSJ 16.

[143] *Id.*

[144] Damages Disclosure 11–12.

[145] MSJ 16 (emphasis in original).

development costs are relevant to damage awards, regardless of which party incurred those costs.[146]

Neither party cites to any Utah caselaw that addresses the issue of breach of contract damage and value calculations on this point. Instead, they rely on various decisions from other jurisdictions.[147] But even these out-of-state cases do not directly support the parties' respective positions or squarely address the issue at hand. In the absence of any Utah case or other persuasive authority directly on point, the court turns to general principals of contractual damages in Utah.

As previously stated, "an award of damages in a breach of contract case attempts to 'place the aggrieved party in the same economic position the party would have been in if the contract was not breached.'"[148] The Utah Supreme Court has declared that:

> [T]he injured party in a breach of contract action has a right to damages based upon his expectation interest as measured by "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform."[149]

Thus, general damages for a breach of contract in Utah are measured as the difference between the market value of the promised property and the contract price the plaintiff would have paid.[150]

---

[146] Opp'n 27.

[147] *See* MSJ 16; Opp'n 27–28.

[148] *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶ 28, 424 P.3d 897, 904 (quoting *Christensen & Jensen, P.C. v. Barrett & Daines*, 2008 UT 64, ¶ 26, 194 P.3d 931).

[149] *TruGreen Companies, L.L.C. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 10, 199 P.3d 929, 931 (quoting *Ford v. Am. Express Fin. Advisors, Inc.,* 2004 UT 70, ¶ 39, 98 P.3d 15).

[150] *See McCleve Props., LLC v. D. Ray Hult Fam. Ltd. P'ship,* 2013 UT App 185, ¶ 17, 307 P.3d 650, 657 (quoting *Ranch Homes, Inc. v. Greater Park City Corp.*, 592 P.2d 620, 624 (Utah 1979)) ("[G]eneral damages are 'those resulting from the ordinary and obvious purpose of the contract,' which in the case of an option agreement 'would be the loss of the bargain represented by the difference between the market value of the [property] and the option price.'").

24

The question here is whether Steelray has produced evidence that would allow the jury to determine the market value of the Overstock Cars website with reasonable certainty. In other contexts, Utah law defines market value as "the price for which an article is bought and sold and for which there exists a demand in the market place."[151] Evidence that directly shows what a willing buyer would pay for an asset clearly establishes market value. The cost of replacing a lost asset or contractual benefit can also establish market value where other facts demonstrate that the replacement price was reasonable in the market.[152] However, standing alone, the price paid by a defendant to develop and create an asset necessarily establishes the value at which that technology could be sold in the market. Especially in the context of new technology of uncertain benefit, there is no guarantee that the costs of researching, developing, and implementing the technology will inform the value to buyers on an open market.

Here, Steelray bases its damages on Overstock's expenditures in developing the Overstock Cars website and its web-scraping technology.[153] But Steelray provides no evidence to establish that these expenditures reflect what a buyer would pay for the website in the market or what Steelray would have to reasonably spend to reproduce the website and technology. Steelray might have provided expert testimony on this issue but, for whatever reason, chose not to do so. As Steelray itself puts it, "[t]he question is whether Steelray has evidence from which a jury

---

[151] *Winters v. Charles Anthony, Inc*., 586 P.2d 453, 454 (Utah 1978) (defining market value in the context of lost or stolen goods); *see also* Utah Code Ann. § 59-2-102 (defining fair market value as "the amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts" in the context of property value assessment); *State v. Ludlow*, 2015 UT App 146, ¶ 6, 353 P.3d 179, 182 (defining market value as "what the owner [of the property] could expect to receive, and the amount a willing buyer would pay to the true owner for the stolen item" in the context of restitution of pecuniary damages).

[152] *See Alta Health Strategies, Inc. v. CCI Mech. Serv*., 930 P.2d 280, 285 (Utah Ct. App. 1996) (finding that a jury could conclude that the price paid to replace damaged technology was reasonable and represented a fair market value when the seller was the sole supplier of that technology).

[153] Damages Disclosure 11.

could determine Steelray's harm."[154] It does not. Overstock's costs are not Steelray's harm. On these facts, in the absence of any evidence showing the fair market value of the Overstock Cars website, Steelray cannot pursue such damages.[155]

## ORDER

Defendant's [65] Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART, and Defendant's [66] *Daubert* Motion to Partially Exclude Expert Witness Testimony is DENIED.

Signed May 4, 2026.

BY THE COURT

David Barlow
United States District Judge

---

[154] Opp'n 28.
[155] Because Steelray may not proceed under this damages theory, the court does not consider Overstock's argument about offsetting contractual reimbursement terms.

26